UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD S. DELANEY,<br><br>        Plaintiff,<br><br>    v.<br><br>JO ANNE B. BARNHART,<br>Commissioner of the<br>Social Security Administration,<br><br>        Defendant. | Case No. SA CV 05-791-PJW<br><br>MEMORANDUM OPINION AND ORDER |

I.

INTRODUCTION

Plaintiff brings this action seeking reversal of the decision by defendant Social Security Administration ("the Agency") denying his application for Disability Insurance Benefits ("DIB"). He asks the Court to reverse the Agency's decision and award benefits, or, in the alternative, to remand the case to the Agency for further proceedings. For the reasons discussed below, the Agency's decision is AFFIRMED.

## II.
## FACTS

A. <u>Plaintiff's Personal History and Work History</u>

Plaintiff was born on March 11, 1952, and was 52 years old at the time of the hearing. (Administrative Record ("AR") 45, 254, 257.) He completed high school, one year of college, and vocational training for driving and security. (AR 56-57, 258.) He previously worked as a truck driver, an armored truck driver/guard, and a security guard. (AR 52.) Plaintiff contends that, beginning in 1999, his conditions caused him to change employment and have periods of no employment, and, on May 1, 2003, he became unable to work. (AR 52.)

B. <u>Plaintiff's Medical Condition and Treatment</u>

In his application for DIB, Plaintiff stated that he suffered from hernias, gastrointestinal problems, and hypertension, and, in 1999, had undergone a surgical procedure on his colon, leaving an intestinal hernia. (AR 51.) Plaintiff asserted that his condition limited his ability to work because it caused him problems in walking, sitting for extended periods, lifting, and carrying. He also complained of pain, headaches, and dizziness. (AR 51.) In later disability reports, Plaintiff reported lower back pain, post traumatic stress syndrome, memory loss, and fatigue. (AR 72-82.)

Plaintiff's medical records show that he was diagnosed with and sought treatment for an intestinal hernia, hypertension, and diabetes. (AR 193-95, 198-99, 201-05). An MRI of the lumbar spine showed that Plaintiff had mild degenerative disc disease. (AR 169.)

Plaintiff was examined by state agency internist Concepcion Enriquez. Dr. Enriquez found that Plaintiff was mildly hypertensive and had a history of high blood pressure, diabetes, abdominal hernia,

diarrhea, back pain, and anemia. (AR 166.) She noted that Plaintiff had polyuria and polydipsia, indications of poor diabetic control.[1] (AR 167.) She also noted that Plaintiff complained of symptoms of diabetic neuropathy, but examination revealed no motor, sensory, or reflex deficiencies. (AR 166.) Dr. Enriquez observed that Plaintiff had a large and easily reducible incisional hernia. (AR 167.) She noted tenderness and decreased range of motion in Plaintiff's lumbar spine area, but found no signs of radiculopathy. (AR 167.)

C.   The Administrative Proceedings

   Plaintiff filed an application for DIB on October 1, 2003. (AR 87-90.) That application was initially denied on January 22, 2004, and again on reconsideration on April 28, 2004. (AR 28-31, 33-37.) Thereafter, Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was granted, and a hearing was held on March 8, 2005. (AR 38-39, 254-270.)

   Plaintiff testified that he had been collecting disability since May 2003 and had not been working due to his condition and fatigue. (AR 259-60.) Plaintiff explained that he had abdominal pain due to an intestinal hernia, consistent lower back pain, and pain in his arms and legs, which was controlled with medication. (AR 260-61.) He also complained of irritable bowel syndrome (diarrhea), weakness, anxiety, and forgetfulness. (AR 261-62.)

   Plaintiff claimed that he neglected his personal hygiene "at times," and that he was socializing less. (AR 262-63.) Upon questioning by his counsel, Plaintiff testified that sometimes he did

---

[1] Polyuria is defined as the release of abnormally large amounts of urine. The Mosby Medical Dictionary. Polydipsia is defined as having excessive thirst. *Id.*

not feel good enough to shower, and would take a shower every other day or every third day, although he used to shower every day. (AR 268-69.)

Plaintiff testified that he could walk for ten minutes, stand for six minutes, and sit for fifteen minutes before needing to take a break or change position. (AR 263-64.) He also testified that he had pain in his hands and fingers, reduced grip strength, and difficulty manipulating small objects. (AR 264).

With respect to the medications he took, Plaintiff testified that he suffered side effects of tiredness, dry mouth, and insomnia. (AR 265.) Plaintiff claimed that he only drove short distances and had difficulty dressing himself, but otherwise did not do many activities, including housework, shopping, and hobbies. (AR 266.) Plaintiff explained that a friend came over to help him with other things. (AR 269.) According to Plaintiff, he had been using a cane since his abdominal surgery in 1999, but used no other braces or supports, despite the fact that a brace had been recommended for his intestinal hernia. (AR 267-68.)

The ALJ issued a decision denying Plaintiff's application for DIB on March 18, 2005. (AR 12-19.) The ALJ analyzed Plaintiff's claims under the Agency's five-step sequential evaluation process. At step one, he found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (AR 13, 18.) At step two, he found that Plaintiff had low back pain, gastrointestinal problems, diabetes, high blood pressure, irritable bowel syndrome, anemia, and nausea, and that those impairments were "severe." (AR 17-18.) At step three, he determined that none of the impairments alone or in combination met or equaled a listed impairment. (AR 18.)

The ALJ analyzed the medical evidence, including evidence from Plaintiff's treating physicians and the state agency doctors, including a psychiatrist and an internist. (AR 16-17.) He found that Plaintiff's alleged limitations were not fully credible because they were not supported by the medical evidence, and because Plaintiff's daily activities were inconsistent with his allegations of pain and limitations. (AR 15-16.)

The ALJ adopted the assessment of residual functional capacity formulated by a state agency consultant, finding that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently and stand, walk, or sit for a total of six hours each in an eight-hour workday. (AR 16, 18.) He found no indication of pushing/pulling, postural, manipulative, visual, communicative, or environmental limitations. (AR 18.)

The ALJ concluded that Plaintiff had the residual functional capacity to perform light work, not significantly reduced by nonexertional limitations. (AR 17.) Accordingly, at step four, the ALJ found that Plaintiff was unable to perform his past work as a security guard, which was semi-skilled light to medium work, or as a truck driver, which was semi-skilled medium work. (AR 17.)

At step five, the ALJ consulted the Medical-Vocational Guidelines (the "Grids"), and, taking into account Plaintiff's age, education, and work experience, found that he was not disabled. (AR 17-18.) Plaintiff requested that the Appeals Council review the ALJ's decision. (AR 7.) On June 30, 2005, the Appeals Council denied Plaintiff's request for review. (AR 4-6.) Plaintiff then filed the instant Complaint.

## III.

## ANALYSIS

Plaintiff argues that the ALJ erred when he: 1) found that Plaintiff was not credible, 2) failed to properly consider the side effects of Plaintiff's medications on his ability to work, and 3) relied exclusively on the Grids to determine that Plaintiff could work. (Joint Stipulation ("JS") 2.) For the following reasons, the Court disagrees.

A.  Standard Of Review

"Disability" under Agency regulations is defined as the inability to perform any substantial gainful activity due to any "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A). The Court may overturn the ALJ's decision that a claimant is not disabled only if the decision is not supported by substantial evidence or if the decision is based on legal error. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)(quoting *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir. 1986)). "Substantial evidence" is such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Magallanes*, 881 F.2d at 750. It is "more than a mere scintilla but less than a preponderance." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998). This Court must uphold the ALJ's conclusion even if the evidence in the record "is susceptible to more than one rational interpretation." *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

B.   <u>The ALJ Properly Discounted Plaintiff's Credibility</u>

Plaintiff challenges the ALJ's finding that he was not fully credible, making the circular argument that his testimony regarding his subjective complaints and impairments themselves render his subjective complaints and claims of impairments credible. (JS at 3-4.) Plaintiff also claims that the ALJ failed to provide the required reasons for discrediting his testimony. These claims are rejected.

An ALJ must undertake a two-step analysis when considering a claimant's subjective symptom testimony. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, he must determine if, pursuant to *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir. 1986), the claimant has produced objective medical evidence of an impairment which could reasonably be expected to produce the symptoms alleged. *Smolen*, 80 F.3d at 1281-82. Second, he must determine the claimant's credibility as to the severity of the symptoms. *Id.* at 1282. If the claimant produces objective medical evidence of an impairment and shows that the impairment could be expected to produce the symptoms alleged, the ALJ can only reject the claimant's testimony concerning the severity of the symptoms by citing specific, clear, and convincing reasons for doing so. *Id.* The ALJ may not discredit the claimant's testimony as to degree of pain merely because it is unsupported by objective evidence. *See Bunnell v. Sullivan*, 947 F.2d 341, 343, 346-47 (9th Cir. 1991)(*en banc*).

In making a credibility determination, the ALJ may take into account, among other things: (1) ordinary credibility evaluation techniques; (2) unexplained or inadequately explained failure to seek or follow treatment; and (3) the claimant's daily activities. *Smolen*, 80 F.3d at 1284. If the ALJ's credibility finding is supported by

substantial evidence in the record, the Court may not engage in second-guessing. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

In support of his finding that Plaintiff was not credible, the ALJ stated:

> Although the claimant may have some limitations due to his severe impairments, the undersigned finds that his allegations were not supported by the evidence of record. The objective medical evidence did not document medical conditions likely to cause the extreme limitations that the claimant alleges. Similarly, the treatment notes do not show any continuous abnormal medical findings and muscle atrophy that are likely to accompany the level of inactivity that the claimant alleges.

(AR 15.) The ALJ noted that the polyuria and polydipsia Plaintiff had complained of were indicative of poor control of his diabetes. (AR 15-16.) The ALJ also noted that Plaintiff had complained of symptoms of diabetic neuropathy, but that on motor, sensory, and reflex examination his results were normal. (AR 16.) He also found that the absence of any hospitalizations, physical therapy, and psychiatric care and the lack of any need for assistive devices further undermined his claims of severe impairments. (AR 16.)

These are clear and convincing reasons for discrediting Plaintiff's testimony regarding the alleged severity of his symptoms, *see* SSR 96-7p; *Meanel v. Apfel*, 172 F.3d 111, 1115 (9th Cir. 1999) (recognizing a lack of muscle atrophy is inconsistent with plaintiff's allegations of incapacitating disability); *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989)(holding unexplained failure to seek

treatment or follow prescribed treatment "can cast doubt on the sincerity of the claimant's pain testimony," and affirming ALJ's credibility determination where subjective complaints were unsupported by objective medical evidence and inconsistent with nonmedical evidence), and they are supported by the record. (AR 166 (lack of atrophy noted) and 193 (failure to control diabetes noted and counseled to comply with treatment regimen).)

The ALJ also noted that Plaintiff's daily activities were inconsistent with his claimed level of impairment. The Court does not necessarily agree with the ALJ on this issue. First, Plaintiff's claimed daily activities were minimal, i.e. showering every second or third day, no housework, short drives, etc. Further, these activities would not readily convert into work activities. But, considering all of the reasons provided by the ALJ for discounting Plaintiff's credibility, the Court concludes that there is enough there to support the ALJ's finding that Plaintiff was not credible and that finding will not be disturbed.

C.  <u>The ALJ Did Not Err With Respect To Plaintiff's Claimed Medication Side Effects</u>

Plaintiff argues that the ALJ failed to properly consider the side effects of his medication. In the Joint Stipulation, Plaintiff contends that his reference to tiredness, dizziness, and nausea (caused by the hypertension medication Lotensin) in his disability report, combined with his testimony at the administrative hearing that the medication he took was making him "a little drowsy," demonstrated "significant side effects" and should have been explicitly addressed in the ALJ's decision. (JS at 7-8.) For the following reasons, the Court finds this claim to be without merit.

9

In his initial disability report, Plaintiff stated that he was taking Lotensin for high blood pressure, and that it caused side effects of tiredness, dizziness, and nausea, although he did not claim that those side effects were part of the reason he was unable to work. (AR 59-68.)  In fact, other than an implicit assertion in the Joint Stipulation, Plaintiff has not asserted functional limitations based on drug side effects.

Plaintiff's claims regarding Lotensin are dubious and are called into question by his own treatment records.  In the first place, in support of his claim that Lotensin causes drowsiness, Plaintiff cites to a medical treatise, which lists the side effects of Lotensin as "dizziness, fainting, chest pain, fast or irregular heart beat, confusion, nervousness, numbness and tingling in hands or feet." *See* Joint Stipulation at 7-8.  Thus, even Plaintiff's treatise does not support his claim that Lotensin causes drowsiness.  Second, while the records show that Plaintiff was prescribed Lotensin at various times to control his high blood pressure, the records reflect that, in May 2003, he was taken off Lotensin after complaining about the side effects of that medication and it appears that he was no longer taking it in March 2005, at the time of the administrative hearing.  (AR 230.)  Instead, he was taking Benicar or Diovan.  (AR 192.)

Moreover, while Plaintiff offered the gratuitous comment at the hearing that the medication he was taking was "making [him] a little drowsy," he did not testify that he was taking Lotensin or that it was the Lotensin that was causing his drowsiness.  (AR 259.)  The only other references to medication in Plaintiff's testimony were to pain medication and unidentified "medications from the doctors."  (AR 260, 265.)  When questioned about the side effects of any medications, the

Plaintiff listed tiredness, dry mouth, and insomnia, but made no claim of dizziness or nausea. (AR 265.) Significantly, other than the occasion on which Plaintiff was instructed to discontinue use of Lotensin, the Court finds no evidence in the record that Plaintiff complained to treating doctors or to examining state agency doctors of any side effects. (AR 230.)

Even if Plaintiff had testified that a specific medication or medications were causing significant side effects, the ALJ would have rejected that testimony due to the absence of any mention of side effects in the medical evidence. *See Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985)(requiring clinical evidence to support claims of impairment from drug side effects); *see also Osenbrock v. Apfel*, 240 F.3d 1157, 1164 (9th Cir. 2001)(finding no substantial evidence of impairment from side effects where the record contained "passing mentions of the side effects of [claimant's] medication in some of the medical records, but there was no evidence of side effects severe enough to interfere with [claimant's] ability to work"). Moreover, the claimed side effects, unsupported by medical evidence, were no more than additional subjective complaint testimony, the value of which was discounted by the ALJ in his credibility analysis. *See Thomas*, 278 F.3d at 960 (finding no error in excluding side effects where the only evidence was claimant's testimony, and where the ALJ had found the claimant not credible).

In light of the dearth of evidence of side effects, combined with the fact that it is not even clear if Plaintiff was still taking the medication which he claims caused the side effects, the Court cannot conclude that the ALJ's failure to make specific findings regarding side effects of Plaintiff's medication was in error.

D. <u>The ALJ Was Not Required To Obtain Vocational Expert Testimony</u>

Plaintiff contends that the ALJ was required to call a vocational expert to testify about the availability of jobs that Plaintiff could perform and was not allowed to simply resort to the Grids. (JS at 10-11.) In support of this argument, Plaintiff relies principally on his prior contentions regarding subjective complaints and medication side effects, arguing that those conditions constituted "significant non-exertional limitations," making the ALJ's use of the Grids inappropriate. (JS at 10.) In light of the Court's findings with respect to the ALJ's credibility determination and consideration of side effects, this argument is rejected.

Plaintiff also argues that the ALJ was required to obtain vocational expert testimony at step five because he found at step two that Plaintiff had "severe," non-exertional limitations, a finding, which, Plaintiff argues, precludes the use of the Grids. This argument, too, is without merit.

An ALJ is only precluded from using the Grids if he finds at step five that a claimant has an non-exertional impairment that significantly limits the range of work he could perform. *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 577 (9th Cir. 1988). As the Ninth Circuit explained in *Desrosiers*:

> [T]he fact that a non-exertional limitation is alleged does not automatically preclude application of the grids. The ALJ should first determine if a claimant's non-exertional limitations significantly limit the range of work permitted by his exertional limitations.

*Id.*

The ALJ found at step five that, "The claimant's capacity for light work is substantially intact and has not been compromised by any nonexertional limitations." (AR 19.) This finding, which is supported by substantial evidence, is sufficient to satisfy the mandates of *Desrosiers* and others and permit the ALJ to use the Grids, despite the existence of non-exertional limitations.

As to Plaintiff's argument that a finding at step two that a claimant has a severe, non-exertional impairment mandates a finding at step five that the Grids cannot be used, the Court disagrees. Though the language governing the application of steps two and five are similar--the regulations provide that an impairment is "severe" at step two if it "significantly limits your ability to do basic work activities," 20 C.F.R. § 404.1520(c), and the language of the cases make clear that the Grids should not be used at step five if non-exertional impairments significantly limit the range of work a claimant can do--the tests are not the same. The showing necessary to proceed past step two is a *de minimis* one. At step two, the ALJ merely screens the medical evidence to determine if the case is worthy of proceeding to a full-fledged analysis. *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987). The analysis at step five is different. It is intended to allow the ALJ to make the ultimate determination of whether a claimant is disabled. A finding at step two that a non-exertional impairment is severe does not mean that the ALJ is required to find at step five that this same impairment significantly limits the range of work a claimant can do, precluding the use of the Grids. *Desrosiers,* 846 F.2d at 577. If this were the case, the Grids could not be used in any case in which the ALJ found at step two that a claimant had a severe, non-exertional limitation and, clearly, that is

not the law.  Having found that Plaintiff's non-exertional limitations did not impact his ability to do light work, the ALJ properly relied on the Grids to determine at step five that Plaintiff could work.  *See id.*

## IV.
## CONCLUSION

For the reasons set forth above, the decision of the Agency denying Plaintiff's claim for DIB is affirmed and this case is dismissed with prejudice.

IT IS SO ORDERED.

DATED:    February  28 , 2007.


_____
PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-Soc Sec\DELANEY, R\Memo Opinion _Order.wpd